## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| MANAL MASHAL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 09 C 02963 |
| | ) |
| ROYAL JORDANIAN AIRLINES, a | ) Judge Sharon Johnson Coleman |
| foreign corporation, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Manal Mashal, filed a four count complaint alleging: (1) sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e-2, alleging that she was wrongfully terminated because she was pregnant, she retained an attorney, and her manager's vindictive attitude towards her, (2) retaliatory discharge based on her attorney having contacted defendant the same day that she was terminated, (3) intentional infliction of emotional distress, and (4) breach of contract for failing to pay overtime benefits, flight benefits and profit sharing. Defendant Royal Jordanian Airlines ("RJA") filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). For the reasons that follow, the motion is granted in part and denied in part.

**Legal Standard**

A party is entitled to summary judgment if all of "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When

deciding a motion for summary judgment the Court construes all reasonable inferences in the light most favorable to the non-moving party. Abdullahi v. City of Madison, 423 F. 3d 763, 773 (7th Cir. 2005) . The party who bears the burden of proof on an issue may not rest on the pleadings or mere speculation, but must affirmatively demonstrate that there is a genuine issue of material fact that requires a trial to resolve. Celotex v. Catrett, 477 U.S. 317, 324 (1986).

**Factual Background**

The following facts are undisputed except where noted. Plaintiff Manal Mashal was born in Jordan and worked for defendant Royal Jordanian Airlines in Damascus, Syria, from 1994 to 2001. Mashal resigned from her position with RJA Damascus on February 23, 2001, and moved to the United States. She applied for employment with RJA at O'Hare International Airport on June 4, 2001, and began working part-time for RJA O'Hare on September 15, 2001. Mashal received an employee handbook for RJA employees in the United States, in which it states that RJA employees work "at will" and may be terminated for any reason. At her deposition, in response to the question of whether she had a written employment agreement with RJA, Mashal stated "I do not have a written – no, I do." (Def. Ex. A at 71, ln 23, Dkt. 64-3). Plaintiff has not submitted to the Court a written employment agreement.

Mashal's first two children were born while she was an employee at RJA O'Hare under a different Station Manager and Regional Manager. While pregnant with her first two children, Mashal was permitted time off to attend doctors' appointments and returned to her job after her maternity leave. On December 12, 2006, Mashal was promoted to supervisor. In October 2007, Mashal learned she was pregnant with her third child and shared the news with her co-workers, including Sami Zakha, the Station Manager of Royal Jordanian Airlines at O'Hare, and Raffaella

Insabato, a Supervisor. Plaintiff, Manal Mashal, was also a Supervisor in October 2007.

In the fall of 2007, Royal Jordanian usually had one flight a day arriving and departing at O'Hare, except during the Hajj holiday season (December of that year), there were two flights a day. The RJA flight usually arrived at 4:00 p.m., but periodically was scheduled for 2:00 p.m. Due to this flight schedule, RJA employees at O'Hare could agree among themselves that one person would arrive at 9:00 a.m. or 10:00 a.m. and work until 5:00 or 6:00 p.m., and the others would arrive later at 11:00 a.m. or noon and work until 10 p.m. or later. RJA's company policy in 2007 did not require a doctor's note for an employee to take time off to visit a physician. Mashal's personnel records do not indicate that she took any sick days between October 2007 and her termination in January 2008. Mashal asserts in her affidavit that Sami Zakha refused to approve her sick days for doctors' appointments because he did not consider pregnancy an illness eligible for paid sick leave.(Pl. Ex. A, ¶ 34, Dkt. 80-1). Mashal took two annual leave days off in October of 2007, one of which was for a doctor's appointment. Mashal testified in her deposition that two or three times she took off work to go to the doctor and sometimes went to the doctor and then returned to work more hours. (Def. Ex. A, at 35, Mashal dep. at 86, ln 23 - 87, ln 9, Dkt. 64-3).

On December 17, 2007, Mashal issued an upgrade to a passenger through the use of a Miscellaneous Charge Order (MCO) for which it was her responsibility to obtain payment before she left work on the evening the flight departed. Mashal voided the MCO that was used to pay for an upgrade from economy class to business class and the money representing the value of the MCO did not appear on the Royal Jordanian sales report.

On January 7, 2008, Zakha told Mashal to turn in her keys and not return to work for

several days. Zakha testified that he believed Mashal was favoring a friend by allowing him to travel in business class without paying for the upgrade. On January 8, 2008, with the assistance of a friend, Mashal sent an email to RJA regarding the incident with the voided MCO. On January 9, 2008, with the assistance of the same friend, Mashal sent an updated email to RJA that was forwarded to Nabil Bataineh, the RJA North American manager in New York City. The updated email stated:

> "Upon discussing the facts of this matter with Amal, the Swiss Port agent who witnesses all the unsuccessful trials of charging the credit card, Amal corrected my recollection about the incident informing me that it was her who decided to void the second MCO and not me, because she didn't want to keep hanging on without a result. This forgotten fact gave me a great relief because up until this point I considered the voiding decision to be my basic mistake in this incident and I held myself responsible for it. But now, given this fact, I don't hold myself responsible anymore for voiding the unsuccessful MCO number. I acknowledge though that, despite all the circumstances mentioned above that formed an obstacle for me to verify the completion of this transaction up until January 7, 2008, and despite my numerous trials to get it done, it was still negligence of me to let this transaction issue go unsolved and unverified for so many days."

On August 2, 2010, Amal Djellouli prepared a statement in which she said that Mashal "asked [her] to sign the report that [Amal] was the one who voided the MCO by [her]self without [Mashal's] knowledge and not according to her instruction." (Def. Ex. L, Dkt. 64-9).

A meeting was scheduled for January 10, 2008, at which Mashal was to discuss the MCO incident with Nabil Bataineh, the manager of RJA North America. On January 10, 2008, Mashal retained attorney Christopher Cooper. Attorney Cooper's affidavit states that on or about January 10, 2008, he telephoned RJA and informed the person to whom he spoke that he represented Manal Mashal and asked to attend the meeting. The meeting was cancelled. Bataineh testified that the meeting was cancelled because Attorney Cooper told him not to communicate with Mashal. Attorney Cooper stated that he called RJA's New York offices

4

several times on January 11, 2008, and left messages. That same day he faxed a letter to RJA stating that he represented Mashal, that all communication should be directed to him and outlining Mashal's complaints against Sami Zakha. On January 11, 2008, Bataineh sent Mashal a letter terminating her employment. The letter did not state a reason for the termination. Bataineh testified in his deposition that Mashal was terminated because there was money missing from the RJA sales report from O'Hare as a result of the voided MCO. Mashal stated in her affidavit that Bataineh told her over the phone that she was terminated for having threatened the royal kingdom by obtaining a lawyer.

Approximately ten days after her termination, Mashal informed Bataineh that in the summer of 2007, Sami Zakha had improperly allowed certain passengers to travel aboard a Royal Jordanian flight without paying the proper fare, resulting in a loss of $4000 in revenue to RJA. Bataineh had no knowledge until after Mashal was terminated about her complaints about Zakha and his allegedly allowing passengers to travel on RJA without paying the fare.

Thereafter, Mashal filed a Charge of Discrimination with the EEOC alleging that she was terminated by RJA because she was a woman and pregnant. The Charge was amended to include a retaliation claim. On February 27, 2009, the EEOC concluded that the information obtained in its investigation did not establish a violation of the statutes. The EEOC issued a right to sue letter.

Subsequent to her termination, Mashal has availed herself of RJA flight benefits for herself and her family to fly from Chicago to Damascus, Syria in 2006, 2007, 2008, and 2009. She was paid $635.52 for what RJA calls "profit-sharing" and Mashal states was a bonus. Mashal contends that a dispute arose as to the amount of overtime she had accrued as of

December 2006. RJA issued a check on December 13, 2006, in the amount of $5,722.57 for overtime, which Mashal cashed and returned the letter with a handwritten note acknowledging receipt of some of her overtime.

On May 15, 2009, Mashal filed a five count complaint that was later amended to four counts alleging: (1) violation of Title VII for wrongful discharge based on sex discrimination, hiring a lawyer, and her manager's vindictiveness due to her being a women; (2) retaliatory discharge for engaging a lawyer to represent her; (3) intentional infliction of emotional distress; and (4) breach of contract for withholding flight benefits, profit sharing, and unpaid overtime. Defendant has moved for summary judgment on all counts claiming *inter alia* that it had a legitimate non-discriminatory reason for terminating plaintiff's employment, it did not knowingly engage in extreme and outrageous conduct, and that plaintiff was paid the overtime she was owed, has made use of the flight benefits, and retirement funds or further stock options.

**Discussion**

*1. Sex Discrimination Claim*

Title VII of the Civil Rights Act makes it "an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual or to otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C.§ 2000e-2. In 1978, through the Pregnancy Discrimination Act, pregnancy was brought under the rubric of discrimination on the basis of sex. See 42 U.S.C. §2000e(k). "While the PDA does not impose an affirmative duty on employers to offer maternity leave or to take other measures to assist pregnant employees, it does require that the employer treat the employee as well as it would have if she were not

pregnant." Kennedy v. Schoenberg, Fisher & Newman, 140 F.3d 716, 722 (7th Cir. 1998) (citing Piraino v. International Orientation Resources, Inc., 84 F.3d 270, 274 (7th Cir. 1996)).

A plaintiff may avoid summary judgment and prove sex discrimination either through direct evidence of discrimination or through the indirect, burden-shifting, approach set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed. 2d 668 (1973). Direct evidence is evidence that, "if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." Hunt-Golliday v. Metropolitan Water Reclamation Dist., 104 F.3d 1004, 1010 (7th Cir. 1997)(quoting Randle v. LaSalle Telecommunications, Inc., 876 F.2d 563, 569 (7th Cir. 1989)). In pregnancy discrimination cases, direct evidence of discriminatory intent is in the "form of an admission by a supervisor or decision maker that the employee was suspended because she was pregnant." Kennedy v. Schoenberg, Fisher & Newman, 140 F.3d 716, 723 (7th Cir. 1998). The Seventh Circuit has opined that to rise to the level of direct evidence of discrimination, "isolated comments must be contemporaneous with the discharge or causally related to the discharge decision making process." Geier v. Medtronic, Inc., 99 F.3d 238, 240, 242 (7th Cir. 1996). If the plaintiff succeeds in presenting sufficient direct evidence of discrimination, the defendant must respond by proving that it would have made the same employment decision even if it had not taken the impermissible factor into account. Randle, 876 F.2d at 569.

Here, plaintiff has chosen to take the direct evidence approach for opposing summary judgment. Plaintiff contends that Sami Zakha, the Station Manager for RJA at O'Hare, discriminated against her by denying her paid leave to see her obstetrician or any other physician in relation to her pregnancy. Defendant denies that Zakha discriminated against plaintiff and

7

argues that RJA employees at O'Hare did not need to use any benefit time to see a physician because shifts generally did not begin until late morning or early afternoon. The record shows that the employee handbook for RJA employees in the United States specifically allows sick time to be used for physician appointments. Although plaintiff avers that during the fall of 2007, while she was pregnant with her third child, she used at least one "personal day" or annual leave day to see her physician, plaintiff presents no evidence that she was treated any differently because of her pregnancy. Apart from plaintiff's own statements that Sami Zakha denied her paid sick days to see her physician for pregnancy related issues, there is nothing in the record to suggest such a correlation. Therefore, there is no material question of fact as to whether plaintiff was discriminated against based on her sex or pregnancy.

Plaintiff further alleges that she was wrongfully terminated when she hired an attorney who brought her discrimination complaints to the attention of RJA management. Defendant contends that plaintiff's termination was the result of her own actions involving the mishandling of company funds. Plaintiff admits that she failed to promptly inform her superiors of the circumstances surrounding the voided MCO on December 17, 2007. Plaintiff was terminated the same day that a meeting was to take place with RJA's North American manager to investigate the circumstances of December 17, 2007, and the voided MCO. The meeting was cancelled when Nabil Bataineh received the faxed letter from plaintiff's then attorney, Christopher Cooper. Although the employee handbook states that RJA employees are "at will" employees who can be terminated at any time for any reason, Zaid Lambaz, the former Station Manager for RJA at O'Hare, suggested in a statement that progressive discipline precedes termination. Accordingly, when viewed in the light most favorable to plaintiff there is a genuine issue of fact as to whether

8

the reason RJA provided for her termination was pretextual or it would have terminated plaintiff regardless or whether her attorney informed RJA of plaintiff's complaints of discrimination. Those questions of fact however relate to her claim of retaliatory discharge rather than sex discrimination.

*2. Retaliatory Discharge*

Title VII, protects individuals from certain forms of discrimination and from retaliation for complaining about the types of discrimination it prohibits. See Miller v. American Family Mut. Ins. Co., 203 F.3d 997, 1007 (7th Cir. 2000). To prevail on a claim of retaliation, the plaintiff must show, by preponderance of the evidence, that he: (1) opposed an unlawful employment practice [under Title VII]; (2) was the object of an adverse employment action; and (3) that the adverse employment action was caused by his opposition to the unlawful employment practice. Hamner v. St. Vincent Hospital and Health Care Center, Inc., 224 F.3d 701, 705 (7th Cir. 2000).

Here, plaintiff contends that RJA retaliated against her in anticipation of her filing a discrimination lawsuit when it terminated her within a day of her hiring an attorney. The Supreme Court in Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 50 L.Ed.2d 471, 97 S.Ct. 568 (1977), held that a plaintiff claiming retaliatory discharge based on the First Amendment must show that her conduct was constitutionally protected and that the conduct was a "substantial factor" or a "motivating factor" for the discharge. If the plaintiff carries her burden, then the defendant must establish that it would have reached the same decision "even in the absence of the protected conduct." Id; Pugh v. City of Attica, 259 F.3d 619, 630 (7th Cir. 2001).

9

Plaintiff alleges that after her supervisor, Sami Zakha, the RJA station manager, reported to Nabil Bataineh, the manager of RJA North American, that plaintiff had voided an MCO without obtaining payment from the customer and that Mashal personally knew the customer who appeared to receive a free upgrade from economy to business class, Bataineh scheduled a meeting with her on January 11, 2008. Prior to that meeting, on January 10, 2008, Mashal hired attorney Christopher Cooper. As soon as Attorney Cooper notified RJA that plaintiff was represented by counsel and that he intended to file an EEOC discrimination charge on her behalf, the meeting was abruptly cancelled and plaintiff was terminated. Defendant argues that the mishandling of company funds is a legitimate cause for termination and that the meeting was cancelled because Attorney Cooper told RJA management not to communicate with plaintiff except through her attorney.

Suspicious timing can constitute circumstantial or indirect evidence to support a claim of retaliation. Pugh, 259 F.3d at 628; see Foster v. Arthur Andersen LLP, 168 F.3d 1029, 1034 (7th Cir. 1999). Timing alone does not create a genuine issue of fact as to pretext if the plaintiff is unable to prove through other circumstantial evidence that she was terminated for a reason other than that proffered by the employer. Pugh, 259 F.3d at 629; see also King v. Preferred Technical Group, 166 F.3d 887, 894 (7 th Cir. 1999)(holding that the time lapse of one day, in combination with the fact-specific affidavit of the plaintiff and her husband, were sufficient to "cast doubt" on the reasons offered by the employer for the plaintiff's termination under the Family and Medical Leave Act.)

Here, plaintiff put forth her own affidavit regarding her allegations of discriminatory conduct, the hiring of her lawyer, and the abrupt cancellation of the meeting followed by her

10

immediate termination. Attorney Cooper swore in his affidavit that he made several phone calls to Nabil Bataineh and the RJA New York offices on January 10, 2008, and January 11, 2008. Attorney Cooper asked whether the company would have any objection to him accompanying plaintiff to the meeting scheduled for the afternoon of January 10, 2008. Attorney Cooper also provided records that indicated the calls he made to RJA offices on January 11, 2008, and that also indicated successful fax transmissions to RJA's Chicago office at 1:27:43 p.m. and to RJA's New York office at 1:08:41 p.m. and 1:27:44 p.m. on January 11, 2008. It is undisputed that plaintiff was terminated on January 11, 2008, the letter of termination is in the record. When viewed in the light most favorable to plaintiff, these facts indicating the timing of her termination are sufficient to "cast doubt" on the reasons offered by defendant for plaintiff's termination.

*3. Intentional Infliction of Emotional Distress*

Plaintiff alleges intentional infliction of emotional distress caused by the loss of her job. Under Illinois law, intentional infliction of emotional distress requires: (1) extreme and outrageous conduct; (2) intending to inflict severe emotional distress or knowing that there is a high probability that it will inflict severe distress; and (3) the conduct in fact caused severe emotional distress. McGrath v. Fahey, 533 N.E.2d 806, 809, 126 Ill.2d 78 (Ill. 1988). The defendant's conduct must be so extreme as to go beyond all possible bounds of decency. Restatement (Second) of Torts § 46, Comment d, at 73 (1965).

Plaintiff does not challenge summary judgment on this issue. Accordingly, summary judgment is granted on this issue.

*4. Breach of Contract*

To prevail on a breach of contract claim under Illinois law, a plaintiff must show: (1) the existence of a valid and enforceable contract; (2) performance under the contract by plaintiff; (3) the breach of the contract by the defendant; and (4) a resulting injury to plaintiff. Horwitz v. Sonnenshein Nath & Rosenthal LLP, 399 Ill.App.3d 965, 973 (1st Dist. 2010).

Plaintiff asserts that she was wrongfully denied certain benefits owed to her under her employment contract including stock options, overtime pay, and severance. Plaintiff has not produced a written contract. This Court will assume for purposes of this motion, that the contract pursuant to which plaintiff is claiming these benefits is the employee handbook for RJA employees in the United States. The record reflects that RJA stock is available for purchase by employees at a discount on October 18 of each year. It is undisputed that plaintiff was not permitted to purchase RJA stock at the employee rate on October 18, 2008, because she was no longer employed by the company. Defendant issued a check for $5,722.57 for "settlement of all overtime/holidays due to you." (Plaintiff's Ex. G). Plaintiff cashed the check and signed as "Received & Accepted" the return acknowledgment. Plaintiff wrote words of protest, however, words of protest on a negotiable instrument have no effect under Illinois law where there is accord and satisfaction. See McMahon Food Corp. v. Burger Dairy Co., 103 F.3d 1307, 1312 (7th Cir. 1996). Thus, this Court finds no material issue of fact for plaintiff's claims for breach of contract based on additional overtime pay and stock options.

Lastly, with regard to severance pay, the employee handbook for RJA employees in the United States permits severance pay for employees who have worked for the company for 10 years. It is unclear from the record whether the ten years employment must be continuous and only within the United States. Plaintiff worked for RJA in Syria from 1994 to 2001, at which

point, she resigned and moved to Chicago. On June 4, 2001, plaintiff submitted an application for employment with RJA at O'Hare. (Def. Ex. D, Dkt. 64-9). Plaintiff had the same employee number both in Syria and the United States and several of her personnel records indicate her start date with the company as 1994. Accordingly, there is a question of material fact with respect to whether RJA was required to pay her severance.

**Conclusion**

Based on the foregoing, defendant's motion for summary judgment is granted in part and denied in part. The motion is granted as to Count I for sex discrimination based on plaintiff's pregnancy. Summary judgment is also granted as to Count III and claims under Count IV for overtime pay and stock options. The motion is denied as to Count II for retaliation, and Count IV on the sole issue of severance pay.

IT IS SO ORDERED.

Date:   September 13, 2011

Entered: _____
Sharon Johnson Coleman